IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

| | |
|---|---|
| **Kimberly Kay Barnett**, | ) |
| Plaintiff, | ) CASE No. 1:13-cv-0047 |
| | ) SENIOR JUDGE NIXON |
| vs. | ) MAGISTRATE JUDGE BROWN |
| **Carolyn Colvin,** | ) |
| **Commissioner of** | ) |
| **Social Security** | ) |
| Defendant. | |

**To: The Honorable John T. Nixon, Senior United States District Judge**

<u>Report and Recommendation</u>

This action was brought, pursuant to 42 U.S.C. §§ 405(g), to obtain judicial review of the final, unfavorable, decision of the Social Security Administration ("SSA") by the SSA Commissioner ("the Commissioner") regarding plaintiff's application for Disability Insurance Benefits ("DIB") under Title XVI of the Supplemental Social Security Income Act ("SSI") 42 U.S.C. §§ 416(i), 1382(c). For the reasons explained below, the undersigned **RECOMMENDS** that the Plaintiff's motion for judgment on the record be **GRANTED** and the case be **REMANDED** to the Commissioner for reconsideration.

I. <u>PROCEDURAL HISTORY</u>

Kimberly Kay Barnett ("Plaintiff") initially filed for DIB under Title XVI of the Social Security Act, 42 U.S.C. § 1382(c), on July 21, 2008. (Docket Entry 11 ("Doc. 11"), p. 56.) Plaintiff's original claim to DIB was based upon the adverse effects of asthma, and was disapproved on August 27, 2008. (Doc. 11 pp. 56, 59.) Plaintiff subsequently filed for DIB on October 22, 2009, and, as with her first application, Plaintiff's claim was disapproved on March

8, 2010 and again upon reconsideration on June 7, 2010. (Doc. 11 pp. 56, 58, 134-36.) On July 15, 2010, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), Troy M. Patterson. (Doc. 11 p. 37.) The hearing was conducted on October 15, 2011. (Doc. 11 p. 37) Present for the hearing were Plaintiff, her attorney David Downard, and vocational expert ("VE") Tyra Watts. (Doc. 11 p. 13.) In his review of Plaintiff's claims, the ALJ considered many medical issues clearly documented in Plaintiff's medical records—asthma, allergies, GERD, dermatitis, anemia, benign fibrocystic breast disease, allergic rhinitis, allergic conjunctivitis, tachycardia, high blood pressure, a ruptured right eardrum, depression, vertigo, fibromyalgia, and chronic pain and fatigue. (Doc. 11 pp. 15, 17-23.)

The ALJ denied Plaintiff's application for DIB on October 31, 2011 and Plaintiff requested review of the ALJ's determination on December 27, 2011. (Doc. 11 pp. 6-8, 10-25.) The SSA Appeals Council denied review of the ALJ's determination on April 16, 2013, rendering the ALJ's decision the Commissioner's final determination. (Doc. 11 pp. 1-3.)

Plaintiff brought this action in federal district court on May 13, 2013 seeking judicial review of the Commissioner's decision. (Doc. 1.) The Commissioner filed an answer and a copy of the administrative record on July 22, 2013. (Doc. 10, 11.) On August 23, 2013, Plaintiff moved for judgment on the administrative record (Doc. 13), and the Commissioner responded on September 23, 2013. (Doc. 14.) Plaintiff filed reply to the Commissioner's response on October 3, 2013. (Doc. 16.)

This matter is properly before the court.

## II. THE RECORD BELOW

**A. Medical Evidence**

The record reflects that Plaintiff was diagnosed with asthma and a myriad of allergies in February of 2004 and was prescribed albuterol and Advair to control those conditions. (Doc. 11 p. 287.) In June of 2007, however, Plaintiff proved unable to tolerate corticosteroids; prompting her treating physician to prescribe Foradil in place of Advair and to supplement Plaintiff's allergy treatment with Singulair. (Doc. 11 pp. 284, 372.) At that time, Plaintiff began to complain of chronic fatigue. (Doc. 11 p. 284.)

In conjunction with Plaintiff's initial DIB claim, she was examined on August 18, 2008, by Dr. Darrel Rinehart, a Disability Determination Services ("DDS") expert who practices internal medicine. Dr. Rinehart noted that Plaintiff complained of asthma, GERD, and vertigo, which were generally well controlled with medication. Dr. Rinehart noted that Plaintiff had full range of motion in all joints and that she could "typically walk up to two blocks at her own pace. She can sit and stand really relatively well. She is a little limited with her lifting." Based upon these observations, Dr. Rinehart concluded that Plaintiff "has no impairment related physical limitations." (Doc. 11 pp. 274-76.) Likewise, on August 27, 2008, Dr. James N. Moore, also a DDS expert,[1] concluded from a review of Plaintiff's medical files that her asthma, acid reflux, vertigo, and high blood pressure were non-severe and well controlled with medication. (Doc. 11 p. 280.)

On January 12, 2009, Plaintiff presented to her treating physician with diffuse joint pain and an increase in depression in addition to asthma, allergies, Gastroesophageal Reflux Disease ("GERD"), and anemia. (Doc. 11 p. 283.) Plaintiff's allergy medication was changed from Singulair to Zyrtec to relieve her depression. (Doc. 11 p. 283.) On November 9, 2009, despite taking Allegra each morning, Plaintiff complained of "severe allergic eye symptoms" and a "rash

---

[1] Dr. Moore indicated a specialty code of "12" on the MSS which he completed on August 27, 2008. According to SSA Program Operations Manual System ("POMS") DI 26510.090(C) & (D) ("POMS"), a specialty code of 12 corresponds to family or general practice.

3

to [her] bilateral legs."[2] (Doc. 11 p. 281.) Plaintiff's physician prescribed Patanol to resolve Plaintiff's eye allergy and discontinued the iron supplement she took for anemia as it was the likely source of Plaintiff's rash. (Doc. 11 p. 281-82.)

On February 26, 2010, Dr. Marvin H. Cohn, a DDS expert,[3] reviewed Plaintiff's medical records and concluded that Plaintiff experienced no exertional, postural, or manipulative limitations. (Doc. 11 pp. 314-20.) According to Dr. Cohn's assessment, Plaintiff's asthma, allergies, dermatitis, GERD, and iron deficiency, were all well controlled with medications; Plaintiff experienced no weaknesses, her strength was normal; and the record indicated she had a full range of motion with normal stability, strength, and tone. (Doc. 11 p. 321.) Dr. Cohn did note, however, that Plaintiff should "avoid all exposure to fumes, gases, odors and poor ventilation due to her diagnosis of asthma & allergies." (Doc. 11 p. 321.) Dr. Cohn's assessment was confirmed by Dr. Carolyn M. Parrish M.D. on June 5, 2010, despite "worsening of symptoms" and the addition of a left breast cyst and "musculoskeletal type pain" noted subsequent to Dr. Cohn's review. (Doc. 11 p. 347.) Just as with Dr. Cohn's opinion, Dr. Parrish's conclusions were drawn from her review of Plaintiff's medical record at that time.

By July of 2010, Plaintiff suffered from fibrocystic breast disease, a B12 deficiency, asthma, allergies, anemia, GERD, and chronic fatigue and pain. (Doc. 11 p. 368.) On July 27, 2010, Dr. Gannon, Plaintiff's treating physician, observed that a recent ultrasound revealed a "significant cyst" in Plaintiff's left breast and that Plaintiff's breasts were "quite tender to palpation" despite experiencing "some assistance" from Lodine[4] and Vitamin E. (Doc. 11 p.

---

[2] At some time prior to November of 2009, Plaintiff's allergy prescription was altered from Zyrtec to Allegra for an unspecified reason.

[3] Dr. Cohn indicated a specialty code of "19" on the MSS which he completed on February 26, 2010. (Doc. 11 p. 322.) According to POMS DI 26510.090(C) & (D), a specialty code of 19 refers to internal medicine.

[4] Lodine is a non-steroidal anti-inflammatory drug prescribed to treat pain. *See* http://www.drugs.com/lodine.html.

369.) Dr. Gannon also noted that *all of* Plaintiff's allergies, including the rash on Plaintiff's ankles, were "uncontrolled" despite attempting "multiple different treatment modalities, including Zantac, Benadryl, Allegra, [and] Medrol dosepack." (Doc. 11 p. 366.) Dr. Gannon discontinued Patanol for treatment of Plaintiff's eye allergies and initiated treatment with Patanase instead. (Doc. 11 p. 367.) Dr. Gannon also prescribed B12 injections to counteract Plaintiff's chronic fatigue, but consistent with her "history of having allergic reactions to medications," the combination of B12 injections and Patanase resulted in "a rash on her bilateral forearms and her back." (Doc. 11 p. 367.) Both treatments were discontinued.

In October of 2010, Plaintiff presented to Dr. Gannon with aches, nausea, and vomiting. She and Dr. Gannon discussed the likelihood that Plaintiff may have fibromyalgia. According to Dr. Gannon's case notes, Plaintiff was seen at the "Hope Free Clinic in Nashville, where they suggested that maybe she has fibromyalgia." (Doc. 11 p. 364.) Dr. Gannon observed that Plaintiff "had negative ANA and rheumatoid factor in the past" and was currently taking Celexa. (Doc. 11 p. 364.) The following month, Dr. Gannon noted that Plaintiff complained "of myalgias throughout her entire body," had "many trigger points" associated with fibromyalgia, and current blood work showed "negative rheumatoid factor and a negative ANA." (Doc. 11 p. 362.) Dr. Gannon discontinued Celexa and prescribed Cymbalta at "30mg for one week and then 60 mg thereafter" to treat Plaintiff's fibromyalgia and provided samples of these drugs while Plaintiff "complet[ed] patient assistance paperwork in order to have [her new prescriptions] covered [under TennCare] as she does not have insurance." (Doc. 11 p. 363.)

In January of 2011, Plaintiff reported to Dr. Gannon that Cymbalta was ineffective at controlling her fibromyalgia. (Doc. 11 p. 360.) Dr. Gannon observed that Plaintiff appeared more depressed than normal and experienced pain at 8 on a possible scale of 10. (Doc. 11 p.

5

360.) According to Dr. Gannon's treatment notes, the pain associated with fibromyalgia rendered Plaintiff unable to "cut her food and open jars" or to attend church due to an inability to sit stationary for prolonged periods of time. (Doc. 11 p. 360.) Dr. Gannon provided Plaintiff with samples of Advair because she was "overdue for her Allegra refill," discontinued Cymbalta in favor of Savella to treat Plaintiff's fibromyalgia, and referred Plaintiff to a rheumatologist, Dr. Emilio Rodriguez, for a consultative exam. (Doc. 11 p. 361.)

Dr. Rodriguez' case notes from his initial exam of Plaintiff reveal that she presented with joint pain and stiffness bilaterally, neck pain and stiffness, numbness, and pain in her breasts due to fibrocystic disease. (DE 11 at p. 396.) Dr. Rodriguez identified sixteen different "trigger" points commonly associated with fibromyalgia and observed that Plaintiff's lab test reports dating back to 2010 were unremarkable. (Doc. 11 p. 397-98.) As a result, Dr. Rodriguez ordered additional tests of Plaintiff's creatine and thyroid stimulating hormone levels to rule out conditions that could mirror fibromyalgia. (Doc. 11 p. 397-98.) Ultimately, Dr. Rodriguez concurred with Dr. Gannon's diagnosis and her decision to prescribe Savella. (Doc. 11 p. 398.) However, Dr. Rodriguez recommended a dosage of 50mg rather than 60mg as Dr. Gannon initially planned. (Doc. 11 p. 398.)

On March 4, 2011, Dr. Rodriguez noted some improvement in Plaintiff's symptoms, but that Plaintiff experienced increased depression, insomnia, and vertigo while taking Savella. (Doc. 11 p. 392.) Dr. Rodriguez also prescribed Tylenol Extra-Strength to help with Plaintiff's joint pain and referred her to a specialist, Dr. Stewart, for assessment of vertigo and a psychiatrist for treatment of her depression. (Doc. 11 p. 392.) Dr. Gannon's treatment notes from March 8, 2011, reveal that Plaintiff was doing "fairly well on Savella" but her depression was more severe than when she took Celexa. (Doc. 11 pp. 358-59.) Plaintiff reported that

although she "ha[d] not tried taking [Tylenol] on a regular basis, [it] help[s] somewhat" now that she was taking it. (Doc. 11 p. 358.) Dr. Gannon offered a referral to a psychiatrist to aid with Plaintiff's depression if her family could afford it. (Doc. 11 p. 358.) When asked to help Plaintiff acquire a handicap parking decal, Dr. Gannon informed Plaintiff that she did not qualify for one.[5]

Six days later, on March 14th, Dr. Gannon saw Plaintiff again due to tachycardia, elevated blood pressure, and vertigo. (Doc 11 pp. 356-57.) During the exam, Plaintiff's blood pressure and pulse were elevated from their March 8th states—108/74 and 64—to 150/90 and 100. (Doc. 11 pp. 356-57.) Although Dr. Gannon did not associate these developments with Savella, she did reduce Plaintiff's dosage from 50mg to 25mg until Plaintiff's vertigo consult with Dr. Stewart at the end of the month. (Doc. 11 p. 356.) Dr. Gannon offered an earlier consult with two different vertigo specialists and gave Plaintiff the name and number of a psychiatrist. (Doc. 11 p. 356.) Plaintiff was to call Dr. Gannon if she elected to see a vertigo specialist earlier than her scheduled appointment with Dr. Stewart. (Doc. 11 p. 356.)

Dr. Rodriguez' exam notes from April 26, 2011, indicate that Plaintiff ultimately proved intolerant of Savella and that she was being treated with Flexeril—a muscle relaxant—rather than the traditional course of anti-depressants. (Doc. 11 p. 389.) Treatment notes indicate that Plaintiff's symptoms were worsening with the change and she was experiencing "sensitivity to light, sensitivity to noise, insomnia, stiffness, difficulty remembering, swelling of feet and hands, muscle spasms, fatigue and leg cramps." (Doc. 11 p. 389.) In response, Dr. Rodriguez doubled Plaintiff's dosage of Flexeril from 10mg to 20mg per day. (Doc. 11 p. 391.)

---

[5] The standards for acquiring a handicap placard are much more restrictive than those for DIB benefits. Under Tennessee Law, an individual is only entitled to a handicap placard where they are paraplegic, an amputee, or unable to "walk two hundred feet (200') without stopping to rest." Tenn. Code. Ann. 55-21-102.

7

Treatment notes from June 14, 2011, indicate that the increased dosage of Flexeril provided a "mild improvement," but that Plaintiff could not tolerate a higher dosage due to adverse side effects. (Doc. 11 p. 385.) Despite this "mild improvement," Plaintiff experienced "difficulties with humidity and weather changes" in addition to the symptoms previously noted. (Doc. 11 p. 385.) At the conclusion of her normal follow-up exam, Dr. Rodriguez performed a "disability exam" and completed a Medical Source Statement (Physical) ("MSS") for use in Plaintiff's pursuit disability benefits. (Doc. 11 p. 387.)

According to Dr. Rodriguez' assessment at that time, Plaintiff could lift and carry 10 pounds occasionally but never more than that. Plaintiff could sit for 20 minutes without interruption and stand or walk for 30 minutes before needing to rest. Plaintiff could sit for a total of 2 hours per day, stand for a total of 2 hours per day, or walk for a total of two hours per day without assistance. Dr. Rodriguez concluded that Plaintiff could occasionally use her hands and feet to perform work activities despite the numbness in her hands. She could also climb stairs and ramps or stoop occasionally but should never climb ladders or scaffolds or perform work activities that require her to balance, kneel, crouch, or crawl. (Doc. 11 pp. 352-53.)

As to mobility, Dr. Rodriguez concluded that Plaintiff could ambulate without assistance, walk a block at a reasonable pace or on rough or uneven surfaces, use standard public transportation, and climb a few steps at a reasonable pace with the use of a single handrail. Dr. Rodriguez also opined that Plaintiff cannot perform activities like shopping or travel without a companion for assistance at any time. (Doc. 11 pp. 354-56.) Dr. Rodriguez also concluded that Plaintiff could accomplish many mundane tasks such as prepare a simple meal that did not require her to open jars or cans, feed herself, take care of her hygiene, and sort, handle or use

8

paper files. The stated basis of Dr. Rodriguez' opinion is his expertise as a rheumatologist and his knowledge of the effects of fibromyalgia coupled with asthma. (Doc. 11 p. 356.)

These results remained consistent through Plaintiff's next appointment with Dr. Rodriguez on August 16, 2011. (Doc. 11 pp. 382-84.) Treatment notes from Plaintiff's last visit with Dr. Gannon on September 7, 2011, note no new symptoms and reflect the changes in Plaintiff's medications ordered by Dr. Rodriguez. (Doc. 11 pp. 354-55.)

**B. Testimonial Evidence**

1. *Plaintiff's Testimony*

Plaintiff testified at the hearing that she was 34 years of age and has a high school education. (Doc. 11 p. 37-38.) She lived at home with her parents and her twin sister. (Doc. 11 p. 39.) According to her testimony, Plaintiff had not been gainfully employed since moving to Tennessee from Texas, but did act as "an unpaid receptionist" at her sister's beauty salon occasionally until August of 2009. Plaintiff's duties there consisted of answering the phones and dealing with solicitors on the days that her sister was "tied up doing perms." (Doc. 11 p. 38.)

Plaintiff testified that she could engage in a few chores around the house such as making her bed, putting "cups in the dishwasher," or going for brief walks in the cul-de-sac. However, her asthma prevented her from being exposed to harsh cleaning chemicals and the pain associated with fibromyalgia prevented her from opening jars when preparing meals. (Doc. 11 p. 40.) Although Plaintiff confirmed reports included in pain and fatigue questionnaires from 2008, 2009, and early 2010 (Doc. 11 pp. 172-75, 197-203, 225-34), she testified that her social and recreational activities were severely impaired subsequent to being diagnosed with fibromyalgia.

According to Plaintiff's testimony, while she had regularly gone shopping with her sister at Walmart, attended church services, and attended one BMX event each summer prior to being

diagnosed with fibromyalgia (Doc. 11 p. 40-42.), she had not worked consistently at her sister's beauty salon since August of 2009 and had not attended a church service or a BMX event in more than a year prior to the hearing. Further, while she was still able to accompany her sister to Walmart on Mondays, she could no longer walk all of the aisles. (Doc. 11 p. 41-44.) When asked about her exertional limitations, Plaintiff claimed that she could sit comfortably for 20 minutes at a time and push that to 45 minutes but would be paying a price to do so. (Doc. 11 p. 47.) Plaintiff could walk or stand for 30 minutes without rest, drive a car but could not ride as a passenger without experiencing motion sickness, and could not open bottles or jars. (Doc. 11 pp. 46-47.)

When asked, Plaintiff responded that her fibromyalgia proved the most challenging of her medical problems and described the pain as "excruciating" and the fatigue as debilitating. Doc. 11 pp. 45, 47.) According to her testimony, these conditions were aggravated by her inability to take the anti-depressants initially prescribed to her; relegating her treatment to muscle relaxers and Tylenol Extra-Strength for pain. (Doc. 11 pp. 41, 45-46.)

2. *Vocational Expert's Testimony*

The ALJ posed the following hypothetical to the VE for his assessment:

> assume an individual of the same age, education, and work experience as our claimant, and further assume this individual has a residual functional capacity for work at the light exertional level with the following additional limitations: no concentrated exposure to pulmonary irritants, such as fumes, smoke, dust, gases, etc., no exposure to unprotected heights or dangerous machinery, no production rate pace work, and jobs involving only superficial interpersonal contact with coworkers and the public? Could such an individual perform any work that exists in the economy?

(Doc. 11 p. 47-48.) According to the VE, no work existed in the national or Tennessee economy to accommodate this classification due to the product-rate pace work restriction. (Doc. 11 p. 48.) Without the production-rate pace work requirement, the ALJ testified that work as a "tag strainer

. . . or floor worker" is available to Plaintiff. (Doc. 11 p. 50.) According to the VE's testimony, both positions exist in sufficient numbers in the national or state economies to satisfy the SSA regulations. (Doc. 11 p. 50.)

## III. ANALYSIS

### A. Standard of Review

The District Court's review of the Commissioner's denial of DIB is limited to a determination of whether those findings are supported by substantial evidence and whether correct legal standards were applied. 42 U.S.C. § 405(g); *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011). A finding of substantial evidence does not require all the evidence in the record to preponderate in favor of the ALJ's determination, but does require more than a mere scintilla of support for a denial of DIB. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).

The ALJ's determination is entitled to deference where "a reasonable mind might accept [evidence in the record] as adequate to support" the ALJ's determination even though it could also support a different conclusion. *Rogers*, 486 F.3d at 241; *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). "[F]ailure to follow the rules" promulgated to control the process of benefit determination "denotes a lack of substantial evidence, even where the ALJ's" determination is otherwise supportable. *Cole*, 661 F.3d at 937 (*quoting Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir. 2009)).

### B. Assignments of Error

Plaintiff asserts that the ALJ's treatment of the opinion of her treating physician, Dr. Emilio Rodriguez, and her credibility lack substantial evidence, and that the RFC finding by the ALJ does not represent a function-by-function assessment of her medical conditions. However, because the Magistrate Judge finds that the ALJ's treatment of relevant medical opinion

evidence does not conform to the regulations that control that process, the Magistrate Judge has not considered Plaintiff's claims over the ALJ's RFC assessment or his finding in regard to her credibility.

In his consideration of the medical opinion evidence, the ALJ denied controlling weight to the opinion of Dr. Rodriguez, a treating physician, and, in fact, afforded that opinion less weight than any of the four DDS experts, one examining source and three nonexamining sources. According to Plaintiff, the reasons advanced by the ALJ to deny Dr. Rodriguez' opinion controlling weight are insufficient. (Plaintiff's M., DE 13-1, pp. 6-9.) Further, even if Dr. Rodriguez' opinion is not entitled to controlling weight, Plaintiff argues that his opinion is certainly due relatively more weight than the opinions of the DDS experts. (Plaintiff's M., DE 13-1, pp. 9-13.) In response, the Commissioner argues that the ALJ's determination is supported by the record, and that the inconsistencies noted by the ALJ justify the weight afforded to Dr. Rodriguez' opinion. (Defendant's Response, DE 14, pp. 3-10.) The Magistrate Judge disagrees.

> "Treating-source opinions must be given controlling weight" if two conditions are met: (1) the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and (2) the opinion is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). If the Commissioner does not give a treating-source opinion controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, id., as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence, *Id.* § 404.1527(c)(2)-(6).
>
> The Commissioner is required to provide good reasons" for discounting the weight given to a treating-source opinion. *Id.* §404.1527(c)(2). These reasons must be supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Soc. Sec. Rul. No. 96-2p*, 1996 LEXIS 9 at *12, 1996 (Soc. Sec. Admin. July 2, 1996). This procedural requirement ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule." (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

*Gayheart*, 710 F.3d at 376.

In assessing the opinions of the various experts to consider Plaintiff's physical impairments, the ALJ reasoned:

> [O]n August 18, 2008, and in conjunction with the claimant's prior application, consultative examiner Darrel Rinehart, M.D., stated that the claimant's ability to perform work activities was not limited due to any physical impairment. First, the undersigned notes that new evidence has been admitted into the record since Dr. Rinehart rendered his medical opinion. Second, Dr. Rinehart's opinion is inconsistent with the claimant's medical records. For instance, the medical records show a history of asthma attacks when the claimant is exposed to pulmonary irritants, which conflicts with Dr. Rinehart's opinion that the claimant's ability to perform work activities is not limited due to any physical impairment. Since Dr. Rinehart's opinion is inconsistent with the claimant's medical records, the undersigned assigns it little weight.
>
> On August 27, 2008, and in conjunction with the claimant's prior application, non-examining state agency physician James Moore, M.D., stated that the claimant had no severe medically determinable impairment. First, the undersigned notes that new evidence has been admitted into the record since Dr. Moore rendered his opinion. Second, Dr. Moore was a non-examining physician, who never had the opportunity to examine, or even meet with and question, the claimant. Finally, Dr. Moore's opinion is inconsistent with the claimant's medical records. For instance, the claimant has been diagnosed with multiple medically determinable physical impairments (asthma, vertigo, and fibromyalgia) by several different physicians. Therefore, the undersigned assigns little weight to the medical opinion of Dr. Moore.
>
> In the medical source statement dated February 26, 2010, state agency physician Marvin Cohn, M.D., concluded that the claimant had no limitations except that the claimant must avoid all exposure to fumes, odors, dusts, gases, etc. On June 5, 2010, state agency physician Carolyn Parrish, M.D., affirmed the medical source statement by Dr. Cohn. First, Dr. Cohn and Dr. Parrish were non-examining physicians, who never had the opportunity to examine, or even meet with and question, the claimant. Furthermore, while the environmental limitation included in these medical source statements is consistent with the claimant's medical records and the above stated residual functional capacity, these medical source statements are inconsistent with the claimant's medical records regarding the claimant's vertigo and fibromyalgia, which are well documented in the claimant's medical treatment notes and accounted for in the above-stated residual functional capacity. Therefore, the undersigned assigns some weight to the medical opinions of Dr. Cohn and Dr. Parrish.
>
> The medical source statement dated June 14, 2011, by treating physician Emilio Rodriguez, M.D., that the claimant is disabled is inconsistent with the record as a

whole, and therefore, is not given controlling weight. In his medical source statement, Dr. Rodriguez opines that the claimant cannot perform shopping activities. However, the claimant has stated that she goes shopping at Walmart on a regular basis. Dr. Rodriguez also stated that the claimant cannot hear and understand simple instructions due to a right ear injury. However, the claimant was able to answer questions during the hearing, and the claimant has stated that she answered phone calls for her family's hair salon. Furthermore, in the same medical source statement, Dr. Rodriguez states that the claimant can use a telephone to communicate, which is inconsistent with the inability to hear and understand simple instructions and to communicate simple information. Thus, it appears that Dr. Rodriguez relied on the subjective report of symptoms and limitations provided by the claimant, and seemed to accept as true most, if not all, of what the claimant reported. Yet, as explained elsewhere in this decision, there exist good reasons for questioning the reliability of the claimant's subjective complaints. Finally, while Dr. Rodriguez is a treating physician, he has only seen the patient three times in approximately five months, and Dr. Rodriguez rendered his medical source statement after seeing the claimant only twice. Therefore, the undersigned assigns little weight to the medical opinion of Dr. Rodriguez because it is inconsistent with the record as a whole.

(Doc. 11 p. 22-23.)

As noted above, the ALJ did not find Dr. Rodriguez' opinion unsupported by objective medical evidence. Rather, the ALJ found substantial evidence—that Plaintiff "goes shopping at Walmart on a regular basis" and could hear and communicate at the hearing—contrary to Dr. Rodriguez' opinion. Contrary to the ALJ's finding, however, these activities are not contrary to Dr. Rodriguez' opinion.

According to the regulations, the relevant inquiry is not whether Plaintiff can go shopping but whether she can do the activities of daily living to which she admits on a "regular and continuous basis." *1996 S.S.R. 96-8p*, LEXIS 5, 1; *See Gayheart*, 731 F.3d at 377 (finding that a claimant's ability to leave home, drive, go shopping with his wife, and visit relatives does not necessarily indicate that a claimant is able to engage in those activities on a sustained and continuous basis). Regular and continuous, according to the regulations, refer to the duration of physical exertion rather than frequency. *1996 S.S.R. 96-8p*, LEXIS 5, 1.

Plaintiff's ability to accompany her sister to Walmart regularly—each Monday for an hour and a half—is not inconsistent with Dr. Rodriguez' opinion that she is unable to do so "more than two thirds of the time [or] 8 hours a day, for 5 days a week, or an equivalent work schedule." *1996 S.S.R. 96-8p*, LEXIS 5, 1. Nor is Plaintiff's ability to attend church services for two hours on a Sunday, or attend a BMX event for four hours one day a year. Moreover, the ALJ's assessment focuses upon Plaintiff's claims prior to a diagnosis of fibromyalgia without consideration of the fact that she had not worked at her sister's beauty salon since August of 2009 and had not attended church or a BMX event in more than a year prior to the hearing. *See Gayheart*, 710 F.3d at 378 (finding that an ALJ's selective "focus on isolated pieces of the record is an insufficient basis" for discounting the opinion of a treating source). [6]

Likewise, as Plaintiff asserts, while Dr. Rodriguez indicated that Plaintiff is unable to hear and understand simple instructions on the MSS form, he qualified this statement by noting that Plaintiff had damage to her right ear drum but is able to communicate via the telephone. (A.R., DE-11, p. 356.) It is clear, contextually, that Dr. Rodriguez did not assert that Plaintiff was incapable of hearing as the ALJ inferred. Moreover, Plaintiff's partial hearing loss is irrelevant to Dr. Rodriguez' ultimate opinion. The limitations described by Dr. Rodriguez are attributable to fibromyalgia, his specialty and area of expertise. (A.R., DE-11, p. 356.) Given that Dr. Rodriguez noted Plaintiff's hearing problem despite his lack of familiarity with hearing issues is more a testament to his knowledge of Plaintiff's medical history than it is an inconsistency.

---

[6]   Although the Magistrate Judge does not reach the issue of the ALJ's credibility finding with regard to Plaintiff, the Magistrate Judge notes an apparent "selective" approach taken by the ALJ in his view of the record and his reasoning over Plaintiff's subjective complaints. On remand, the ALJ is cautioned that the approach mandated by regulations is a comprehensive one that considers all of Plaintiff's medical conditions, both severe and non-severe, the impact of treatment regimens on *all* of Plaintiff's medical conditions, and her response to those treatments. A "selective" approach that "focus[es] on isolated pieces of the record" denotes a lack of substantial evidence. *See Gayheart*, 736 F.3d 365, 378 (6th Cir. 2013), SSR 96-8p, 1996 LEXIS 5 at * 13-18.

As such, the Magistrate Judge finds that the ALJ failed to cite substantial evidence that contradicts Dr. Rodriguez' opinion, and, thus, the reasons advanced by the ALJ are insufficient to support a finding that Dr. Rodriguez' opinion is not entitled to controlling weight. Nevertheless, even if Dr. Rodriguez' opinion is not entitled to controlling weight, it is still clearly entitled to significant weight according to the regulations that cabin the ALJ's discretion in weighing the opinions of varying medical professionals.

In addition to regulating the overall DIB determination process, the Commissioner has "elected to impose certain standards on the treatment of medical source evidence." *Gayheart*, 710 F.3d at 375 (citing 20 C.F.R. §§ 404.1512, 1513, 1520). Contrary to the Commissioner's assertion here, the record alone is not the only determinative factor in assessing the validity of a medical source opinion. Rather, the determination of what weight is to be given the opinions of medical experts is based upon seven distinct factors that consider the medical professional's proximity to the claimant's symptoms and the resultant impact on a claimant's functionality. *Gayheart*, 770 F.3d at 376 (citing 20 C.F.R. § 404.1527(c)(2)-(6)).

Presumptively, the opinions of treating sources, such as Drs. Gannon and Rodriguez, are entitled to greater weight than nontreating sources—examining and nonexamining sources—because they are better "able to provide a detailed, longitudinal picture of [a claimant's] medical impairments." 20 C.F.R. § 404.1527(c)(2). Likewise, examining sources presumptively warrant more weight than nonexamining sources. *Id.* This hierarchy can be altered, however, based upon the duration and extent of the treatment relationship between the source and patient, how well the opinion is grounded in the record, the consistency of the opinion with the record, whether the opinion is from a specialist or a general practitioner, and other relevant factors. 20

C.F.R. §§ 404.1527(c)(2)-(6). Consideration of these factors between Dr. Rodriguez and the DDS experts weigh heavily in favor of Dr. Rodriguez.

Unlike all of the DDS experts, Dr. Rodriguez' opinion is based upon a complete medical record and is well grounded in the record as a whole. While the ALJ characterized the opinions of Drs. Cohn and Parrish as being "inconsistent with the claimant's medical records regarding the claimant's vertigo and fibromyalgia," both of these opinions were formed nearly one year prior to Dr. Gannon's diagnosis of fibromyalgia and Dr. Rodriguez' confirmation of that diagnosis. (Doc. 11, p. 23.) Also unlike the DDS experts, Dr. Rodriguez is not only a treating source but a specialist in the treatment of fibromyalgia. Most important here, however, is the fact that Dr. Rodriguez' treatment relationship with Plaintiff was considerably more than cursory as the ALJ implied.[7]

Dr. Rodriguez confirmed a diagnosis of fibromyalgia in January of 2011 through informed consideration of Plaintiff's complete medical history, identification of multiple symptoms characteristic to the disease, and elimination of alternative sources of those symptoms through acceptable medical techniques. Over the six months prior to expressing his opinion, Dr. Rodriguez chronicled the progression of Plaintiff's fibromyalgia, made multiple changes in Plaintiff's medications, referred her to other specialists, and assessed her physical limitations through an examination of those limitations. After eight months of treatment, Dr. Rodriguez' findings were that Plaintiff achieved only "mild improvement" in her ever progressing symptoms, due primarily to an inability to tolerate approved treatment regimens. Plaintiff's

---

[7] Inexplicably, Plaintiff's counsel failed to draw attention, either in their brief here or in their request for reconsideration (Doc. 11 pp. 6-8), to the ALJ's clearly erroneous finding in regard to Dr. Rodriguez' treatment history of Plaintiff. Likewise, perhaps intent on leaving well enough alone, counsel for the Commissioner also failed to draw attention to the ALJ's error or to explain it away. Nevertheless, in assessing the relationship between Dr. Rodriguez and Plaintiff, the ALJ committed clear error when he dismissed Dr. Rodriguez' opinion because he saw Plaintiff "three times in approximately five months, and [] rendered his medical source statement after seeing [her] only twice." The record clearly reflects that Dr. Rodriguez saw Plaintiff *at least* five times and rendered his opinion after Plaintiff's fourth visit. (Doc. 11 pp. 378-393.)

17

condition did not improve through the use of Celexa and Cymbalta, she was unable to tolerate Savella, and, although she is able to tolerate Flexoril, Plaintiff is unable to tolerate a sufficiently high dosage to significantly improve her symptoms.

The Magistrate Judge finds that Dr. Rodriguez is a treating source and is a specialist in his field. His knowledge of Plaintiff's past medical history is current, and the length, frequency, and depth of his treatment is extensive. As a result, Dr. Rodriguez' treatment notes provide a longitudinal picture of the diagnosis and progression of Plaintiff's fibromyalgia that is consistent with those of Plaintiff's primary care physician. As such, under the regulations promulgated to control the ALJ's weighting of medical opinion evidence, Dr. Rodriguez' opinion is entitled to more than "little weight" and substantially more weight than any of the DDS experts who were nontreating and nonexamining sources with a limited and incomplete knowledge of Plaintiff's medical history.

## IV. CONCLUSION

For the foregoing reasons, the Magistrate Judge finds the ALJ's consideration of medical opinion evidence from Dr. Emilio Rodriguez was not conducted in a manner consistent with the regulations promulgated to control that consideration. As such, the ALJ's failure to follow the "regulations denotes a lack of substantial evidence" and dictates that Plaintiff's case be remanded to the Commissioner for reconsideration. *Cole*, 661 F.3d at 937.

## V. RECOMMENDATION

For the reasons stated above, the undersigned recommends that the plaintiff's motion for judgment on the record (DE 13) be **GRANTED** and Plaintiff's claims be **REMANDED** for reconsideration.

The parties have fourteen (14) days of being served with a copy of this R&R to serve and file written objections to the findings and recommendation proposed herein. A party shall respond to the objecting party's objections to this R&R within fourteen (14) days after being served with a copy thereof. Failure to file specific objections within fourteen (14) days of receipt of this R&R may constitute a waiver of further appeal. *Thomas v. Arn*, 474 U.S. 140, *reh'g denied*, 474 U.S. 111 (1986); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004).

**ENTERED** this 11th day of March, 2014.

/s/Joe B. Brown
Joe B. Brown
Magistrate Judge